# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| JANE DOE | § | |
| | § | |
| *Plaintiff,* | § | CIVIL ACTION NO. 4:25-cv-04341 |
| | § | |
| V. | § | |
| | § | |
| SAMEH CHAMI AND UBER | § | |
| TECHNOLOGIES, INC. | § | |
| | § | |
| *Defendants.* | § | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT AND JURY DEMAND

COMES NOW Plaintiff Jane Doe in the above-entitled cause of action, and files this Second Amended Complaint and Jury Demand pursuant to Rule 15(a)(1)(b) of the Federal Rules of Civil Procedure, with leave of Court to clarify and supplement the allegations previously set forth in Plaintiff's First Amended Complaint. This amendment is filed to address and cure the deficiencies raised in Defendant's motion to Dismiss and to more fully set forth Plaintiff's causes of action against Defendants SAMEH CHAMI AND UBER TECHNOLOGIES, INC. ("Defendants") and in support thereof respectfully shows the Court the following:

### I. PARTIES

1. Plaintiff Jane Doe was a resident of Galveston County, Texas, at the time of the incident.

2. Defendant Sameh Chami is an individual residing at 2979 Rolido Dr., Apt. 321 Houston, TX 77063 at the time of the incident. He may be served with process at his last known address, 2979 Rolido Dr. Apt. 321, Houston, TX 77063, or wherever he may be found. **Defendant has been served.**

1

3. Defendant Uber Technologies, Inc. is a Foreign For-Profit Corporation doing business in Texas. It may be served with process through its registered agent, CT Corporation System at 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136, or wherever it may be found. **Defendant has been served.**

## II. VENUE AND JURISDICTION

4. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because this case is between citizens of different states, and the amount in controversy exceeds $75,000.

5. This Court has specific personal jurisdiction over Defendants because the acts giving rise to Plaintiff's claims took place in Texas and Defendants regularly transact business in the State of Texas and their business conducted in Texas specifically gave rise to this incident.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

7. Furthermore, upon information and belief, Plaintiff and Defendant Uber have entered into a terms of use agreement where Texas was selected as the agreed venue for civil disputes such as this subject lawsuit.

## III. JURY DEMAND

8. Plaintiff hereby demands a trial by jury on her claims in this action.

## IV. FACTUAL BACKGROUND

### A. Uber's Background

9. Uber is a transportation company headquartered in San Francisco, California that pioneered an app-based transportation system that eventually spread through the United States and around the world.

10. Uber provides an online and mobile application—the "Uber App." The Uber App connects persons seeking transportation with persons who use their personal vehicles to provide transportation in exchange for compensation. Users request and pay for rides through the customer version of the Uber App. Drivers are notified of requested rides, which they can then accept and be compensated for by Uber through the driver version of the Uber App. Both versions of the app connect to the same website, Uber.com, which is Uber's website.

11. Anyone from the public may download either version of the Uber App for free.

12. Uber historically relies on superficial background checks and has intentionally chosen a less thorough screening process for its drivers. It is well known that an assault happens every eight (8) minutes in an Uber and that Uber has deprioritized mandatory video recording, female passenger pairing and retained a company that will approve drivers within thirty-six (36) hours. Further, Uber fails to properly fingerprint, interview, or train its drivers and wholly fails to implement necessary and essential safety measures to protect its passengers, like the Plaintiff in this case. This creates a dangerous environment for the passengers and fails to protect passengers from sexual assault. Uber prioritizes its financial growth and profits over the safety of its passengers. Uber also controls every detail of the driver and passenger relationship. Uber tracks every move the driver makes; Uber tells its drivers how to drive, and how to interact with the passengers; and Uber controls the drivers' access to individuals such as Plaintiff. Uber can do better and chooses not to do better.

13. Uber maintains complete control over its transportation system, including the Uber App, and so has the ability and responsibility to prevent sexual misconduct facilitated by that system.

14. Uber is the designer and operator of its transportation system, and the designer,

manufacturer, operator, and seller of the Uber App that supports that system.

15. Uber alone decides who can access the Uber App.

16. On the passenger end, Uber decides who will be approved, and on what terms, to be an Uber account holder and thus be able to use the Uber App. This includes promulgating and enforcing rules regarding age restrictions, number of accounts per person, assignability and transferability of the account, and the ultimate right to approve, delete, or deactivate accounts.

17. On the driver's end, Uber alone decides which driver it will recruit, who will receive access to its transportation platform, and on what terms. It chooses whether and how to screen those drivers. It alone decides what background checks to use, how far back to look, what prior offenses will be disqualifying, whether and how to onboard drivers in the absence of meaningful background checks (e.g., when a driver has recently moved to the jurisdiction where the background check is conducted), whether to conduct in-person interviews, whether to conduct in-person trainings or orientations, whether to have any in-person interactions with drivers, whether to conduct drug alcohol screenings, and whether to require training or have drivers take exams.

18. Uber passengers and Uber drivers are subject to Uber's policies and procedures, of which Uber has ultimate authority to enforce.

19. Uber designs the way in which the entire transportation experience will work.

20. Uber selects which driver will be matched with which rider, and the basis on which that match will occur for each individual ride, including the subject ride.

21. Uber decides which aspects of a driver and rider's transportation experience (including but not limited to requesting a ride, requesting a ride for someone else, accepting a ride, locating a rider, locating a driver, getting into a driver's vehicle, driving to a destination,

making stops, changing destinations, adding multiple destinations, arriving at a destination, and disembarking) will be supported by buttons, controls, information, and other tools within the Uber App, or by technology, devices, and services external to the Uber App.

22. When users arrange transportation with the Uber App, they input their destination and request a driver. The Uber App then uses an algorithm to match the user with a nearby driver. Uber drivers must be logged onto the Uber App and indicate their ability to provide rides to be matched with a rider

23. Uber collects GPS data and information on its drivers whenever they are using the Uber App, and on riders from at least the time they request a ride until five minutes after they are dropped off.

24. Uber decides what information will be provided to the passenger about the Uber driver and vice versa. In doing so, Uber has decided that limited information should be provided. Passengers receive only a photo of the Uber driver, along with the driver's first name, the driver's Uber rating, vehicle type and license plate number.

25. Uber handles and decides the outcome of all complaints, issues, and grievances regarding the Uber ride.

26. When an Uber driver or rider sends a support message through the Uber App, or calls Uber with a concern or complaint, Uber responds using automated software programming and, where necessary, deploying a global customer support staff that follows Uber's protocols to address the concern or complaint. Uber facilitates, controls, tracks, and records these interactions via its internal customer service software.

27. Neither drivers nor riders have access to the information on Uber's internal customer service relations platform. Uber has the ability to track and investigate driver and rider

misconduct that occurs when drivers and riders use Uber's transportation services, and over time it has increased its actual tracking of driver misconduct.

28. A rider has no knowledge of an Uber driver's prior bad actions, including whether the Uber driver had prior complaints, is or was under investigation for misconduct, or has been subject to any suspension or other disciplinary action. A rider further has no control over which Uber driver they will be paired with on any ride. Uber alone controls the pairing and controls access to all information between the rider and the driver.

### B. The Subject Assault of Plaintiff

29. On or about June 28, 2025, Plaintiff was a passenger in a vehicle driven by Defendant Sameh Chami on behalf of Uber, and Uber arranged to bring Plaintiff safely to her home under Uber's "Safer Together" program. Defendant Chami ultimately brought her to an undisclosed location and committed sexual and physical assault and false imprisonment.

30. Specifically, Defendant Chami did not take Plaintiff to her requested destination and instead took a long detour, which Uber was aware of in real time.

31. When Plaintiff did not arrive home timely, a family member tracked her to a parking lot on West Boulevard and Friendswood Parkway. Defendant forced himself upon the Plaintiff, unfastened her pants, inserted his hand into her vagina, and assaulted her, causing serious emotional trauma, mental anguish, and physical harm. The assault was discovered when Plaintiff's family used GPS tracking to locate the vehicle and found her in a distraught condition in the vehicle. Plaintiff's family immediately removed her from the vehicle and reported the assault to law enforcement.

### C. Uber's Failure to Implement Safety Tools that Would Have Prevented the Assault

32. Uber's existing safety tools were inadequate to assist Plaintiff when she needed them

6

most.

33. Specifically, Uber did not require cameras that would record the rides to be used by drivers during Uber rides. Uber knows or should have known that cameras would deter sexual assaults if they were required during rides. Before Plaintiff's assault, Uber did not require the same.

34. Furthermore, Uber did not provide Plaintiff with a woman-to-woman matching option when she selected the subject ride. Plaintiff would have elected this option and not have been paired with Defendant Chami.

35. Plaintiff has suffered significant trauma, emotional distress, fear, and humiliation as a result of the Defendants' actions.

### D. Uber's Notice of Prior Driver Activity

36. Uber monitors and possesses data about its drivers, including Defendant Chami, that includes GPS information for rides, prior complaints made about drivers, all ratings made about drivers and background information about the drivers. Riders like Plaintiff are not in possession of this information and trust Uber to monitor driver activity and to remove dangerous drivers from their platform.

37. Upon information and belief, Uber is aware that trip deviations can indicate that a driver may be likely to engage in inappropriate behavior. Upon information and belief Defendant Chami had also previously engaged in trip deviations, which Uber was aware of through its GPS monitoring systems. Nevertheless, Uber paired Defendant Chami with Plaintiff for the subject trip despite actual and/or constructive knowledge of this risk.

38. Furthermore, even when Uber has actual or constructive knowledge that a driver is dangerous and likely to commit sexual assault, it will keep them on the platform. For some

7

sexual offenses and conduct, Uber allows drivers to stay on their platform until a second, third, or fourth incident of sexual misconduct on Uber's platform or if there was "conclusive" evidence of the assault (namely a criminal conviction, admission of fault, or video or photographic evidence). This is despite knowledge that these drivers are likely to re-offend.

39. Upon information and belief, the subject trip was not the subject driver's first trip on the platform and Uber was in possession of information [including either prior no-star ratings or low-star ratings, at the very least] that suggested the driver may have been dangerous to Plaintiff.

### E. Uber's Investigation of Defendant Chami

40. What Plaintiff did not know before she entered the subject vehicle, but Uber did or should have known, is that Defendant Chami should not have ever been able to drive on Uber's platform in the United States, much less be paired with Plaintiff during the subject ride.

41. Defendant Chami entered into the United States in December of 2021 on a B-2 Tourist Visa with permission to remain in the United States for six months. Defendant Chami then was granted an extension until December of 2022 but then failed to depart the United States.

42. Defendant Chami was not legally permitted to work in the United States, including for Uber, on June 28, 2025.

43. However, Defendant Chami was able to operate on Uber's platform as a driver, be matched with the Plaintiff, and drive her home on a late-night ride.

44. Defendant Chami should not have been able to match with Plaintiff, much less be driving for Uber whatsoever on June 28, 2025. Uber's failure to prevent Defendant Chami from doing the same is inexcusable and the direct cause for Plaintiff's horrific sexual assault.

45. Uber's background check, identification and onboarding process is so futile that they

failed to do the bare minimum and even confirm Defendant Chami's legal status in the United States or Uber knowingly allowed Defendant Chami to illegally work for them. Both are inexcusable and exposed Plaintiff to an extraordinary degree of risk.

46. In this case, Plaintiff believed Defendant Chami was meaningfully background checked, meaning that at the very least there would have been an investigation into whether he had previously been convicted for or pled guilty to sexually assaulting someone, murdering someone or committed any sort of violent crime at any point in his life. This belief was based entirely on Uber's representations publicly to Plaintiff that they checked for these crimes.

> **Criminal history:**
> - Certain criminal convictions may l result in disqualification regardless of when they occurred, including murder, sexual assault, and terrorism-related offenses
> - Pending charges may also be disqualifying, unless and until they are resolved in your favor
> - Local regulations may require an individual assessment, including evidence of rehabilitation or good character, depending on where you intend to drive

*See, Uber's Description of their Background Checks.*[1]

47. Upon information and belief, Uber did not follow its own representations for Defendant Chami as it does not conduct background checks in Lebanon for its United States platform. Thus, Uber did not do a meaningful background check for Defendant Chami – at most, they investigated his history in the United States, which only began in December 2021. Defendant Chami was 49 years old at the time of the assault, meaning decades of his life in Lebanon or other countries would not have been subject to a background check for disqualifying crimes.

48. Alternatively, Defendant Chami applied to Uber with false information and Uber's background check and vetting process was and is so deficient that they did not even actually

---

[1] https://help.uber.com/en/driving-and-delivering/article/what-background-checks-look-for?nodeId=ee210269-89bf-4bd9-87f6-43471300ebf2

identify the individual driving on their platform that was matched with Plaintiff, because they would have rejected him from their platform if they could have identified them. In this case specifically, a biometric indicator would have allowed Defendant Uber to actually identify Defendant Chami and prevent them from operating on their platform. Alternatively, a biometric indicator such as fingerprinting would have deterred Defendant Chami from even applying to work as an Uber driver and, thus, prevented the subject ride pairing.

49. In 2013, when Uber opened up its platform to non-professional drivers, its then largest shareholder and CEO Travis Kalanick made the decision that Uber would not fingerprint drivers or run applicants against gold-standard databases, such as FBI records.

50. Instead, he made the decision to use a fast and shallow name-based background check with a short look-back period, and spotty coverage of potentially relevant jurisdictions, records, and crimes. Furthermore, these background checks specifically did not cover the entire adult life of drivers for times they were not living in the United States.

51. Name-based background checks of the sort Uber use present systematic, fundamental problems. First, there is no way to positively identify a person via a biometric indicator, increasing the likelihood of fraud. Second, because names, addresses and birthdays are not unique, the likelihood of false positives (a person linked in error with another's record) and false negatives (someone getting cleared when they should not) is greatly increased. For example, if an individual changes his name, or for some other reason has a criminal history under a different name, the name-based checks can miss the individual's criminal history.

52. Upon information and belief, a fingerprint background check would have prevented Defendant Chami from being able to operate on Uber's platform.

53. Furthermore, Uber made the decision not to interview drivers, talk to drivers, meet

drivers, require any prior experience, get any references, do any other screening beyond the cursory background check, conduct any trainings of any sort, do any drug or alcohol testing, require any tests or exams, or require any up-front investment of time or money on the part of applicants to drive.

54. Upon information and belief, had Uber gone through this process with Defendant Chami, he would not have been driving on their platform.

55. Specifically, this is a ride that occurred in and around Houston, Texas. When Houston, Texas performed their own fingerprint-based background checks, numerous driver applicants who had already been approved by Uber were ultimately rejected by the governmental screenings. However, when the City of Houston pushed Uber to implement fingerprint background checks, Uber instead threatened to leave the city and pushed for Texas to implement statewide legislation allowing Uber to continue to operate without fingerprint background checks.[2]

56. For years, Uber has insisted publicly that fingerprinting is unnecessary and that their background checks are sufficient, specifically in Houston and the State of Texas.[3] This is with actual knowledge, specifically in the city of Houston, that their background checks were not catching all disqualifying crimes and, here, status to work in the United States.

57. Instead of engaging in fingerprinting, Uber has its vendors simply run potential drivers' social security numbers through public databases similar to those held by private credit agencies. These public databases are often incomplete and do not capture all arrests or convictions. The availability and quality of data vary depending on the jurisdiction, and some drivers have spent years living in jurisdictions, including foreign jurisdictions, from which

---

[2] https://www.cnn.com/2018/06/01/us/felons-driving-for-uber-invs
[3] https://observer.com/2018/04/uber-background-checks-fingerprinting/

11

criminal history is very limited or unavailable via public databases. Uber also places unreasonable limits on how far its vendors look back at criminal history, and what types of crimes are disqualifying.

## V. CAUSES OF ACTION

### A. CIVIL ASSAULT (CHAMI)

58. Plaintiff re-alleges each aforementioned allegation as if fully incorporated below.

59. Defendant Chami committed civil sexual assault on Plaintiff. Specifically, Defendant Chami intentionally, knowingly and recklessly caused bodily injury to Plaintiff. Chami knew, or should have reasonably known, that Plaintiff would regard such contact as offensive. As a proximate result of the assault, Plaintiff has suffered damages as described herein. Plaintiff's harm arises as a result of conduct that violates several sections of the Texas Penal Code, including:

   (1) Section 22.01(a)(3), Penal Code (assault);

   (2) Section 22.012, Penal Code (indecent assault); and

   (3) Section 42.07, Penal Code (harassment).

60. Thus, in addition to actual damages, Plaintiff seeks punitive damages, and such damages are not subject to capping.

### B. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (CHAMI)

61. Plaintiff re-alleges each aforementioned allegation as if fully incorporated below. Chami engaged in a conduct to Plaintiff that is extreme and outrageous so as to exceed the bounds of decency in a civilized society. Namely, he caused Plaintiff to experience mental suffering by touching, harassing and offending her.

62. Chami engaged in this conduct intentionally, knowingly, and willfully.

63. Chami's conduct proximately caused injury to Plaintiff. Plaintiff has sustained and will continue to sustain pain and suffering and psychological and emotional distress, mental anguish, embarrassment, and humiliation.

64. Accordingly, Plaintiff is entitled to recovery against Defendant for the damages proximately caused by Defendant's conduct in an amount to be determined at trial. Further, because Plaintiff's harm arises as a result of conduct that violates several sections of the Texas Penal Code, including:

(1) Section 22.01(a)(1) and (3), Penal Code (assault); and

(2) Section 42.07, Penal Code (harassment).

65. Thus, in addition to actual damages, Plaintiff seeks punitive damages, and such damages are not subject to capping.

C. **FALSE IMPRISONMENT (CHAMI)**

66. Plaintiff re-alleges each aforementioned allegation as if fully incorporated below

67. Defendant willfully detained Plaintiff in his vehicle. Plaintiff did not consent to the detention. Without consent, Defendant was to deliver her to her destination but instead took her to an empty parking lot. Defendant had no legal authority or justification to detain Plaintiff. Defendant's wrongful acts caused injury to Plaintiff, which resulted in the following damages and has sustained and will sustain pain and suffering and psychological and emotional distress, mental anguish, embarrassment, and humiliation. Plaintiff seeks damages and exemplary damages within the jurisdictional limits of this Court.

D. **NEGLIGENCE (UBER)**

68. Plaintiff re-alleges each aforementioned allegation as if fully incorporated below.

69. Defendant Uber owed a duty of reasonable care to Plaintiff. Defendant breached this duty

in several ways, including but not limited to the following:

    a.    Failure to implement and woman-to-woman matching for Plaintiff's ride;

    b.    Pairing Defendant Chami with Plaintiff (a young female) on a late-night ride;

    c.    Failing to exercise reasonable care;

    d.    Failing to safeguard Plaintiff's safety as a passenger;

    e.    Failing to promulgate effective safety policies;

    f.    Failing to ensure that safety policies and procedures were enforced and followed; and

    g.    Failing to exercise reasonable control over their independent contractors.

70. Each of these acts and omissions, singularly or in combination with others, constitutes negligence which was the proximate cause of this incident and Plaintiff's injuries.

### E. NEGLIGENT HIRING, RETENTION, TRAINING, AND SCREENING (UBER)

71. Plaintiff re-alleges each aforementioned allegation as if fully incorporated below.

72. Defendant Uber failed to properly screen, hire, and train its drivers, including Chami. Defendant knew or should have known that Defendant Chami should not have been operating as a driver and/or posed a risk of harm to riders like Plaintiff. It was foreseeable that an assault may occur if Defendant did not undertake proper procedures.

73. Defendant provided its driver with direct access to riders, despite failing to adequately investigate, regulate, monitor, and supervise its driver.

Defendant Uber owed Plaintiff duties to:

    a.    Use reasonable care in hiring, screening, and retaining its drivers;

    b.    Use reasonable care in training and supervising its drivers; and

    c.    Implementing adequate safety policies, background checks, and monitoring to protect passengers.

Uber breached these duties by:

a. Allowing Defendant Chami to operate as an Uber driver despite actual or constructive knowledge of his unfitness;

b. Failing to implement adequate driver background checks, including fingerprinting;

c. Failing to actually adequately background check Defendant Chami to determine that he was not in the United States legally at the time he drove Plaintiff, while illegally working in the United States;

d. Failing to fingerprint Defendant Chami; and

e. Failing to supervise and monitor Defendant Chami's conduct.

74. Each of these acts and omissions, singularly or in combination with others, constitutes negligence which was the proximate cause of this incident and Plaintiff's injuries

**F. GROSS NEGLIGENCE (ALL DEFENDANTS)**

75. Plaintiff re-alleges each aforementioned allegation as if fully incorporated below.

76. Plaintiff will further show that the acts and/or omissions of Defendants, when viewed objectively from Defendants' standpoint, involved an extreme risk considering the probability and magnitude of the potential harm to others. Defendants had actual subjective awareness of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety, and/or welfare of others, including Plaintiff. As such, Defendants' actions and omissions constitute gross negligence. Therefore, Plaintiff prays that punitive damages be awarded against Defendants.

**VII. DAMAGES**

77. As a direct and proximate result of Defendants' acts and omissions described above which exceed $2,000,000. Plaintiff has incurred the following damages:

a. Conscious physical and mental pain and suffering, and anguish, past and future;

15

b. Physical impairment, past and future;

c. Loss of enjoyment of life and peace of mind, past and future;

d. Reasonable and necessary medical, counseling, psychiatric, therapeutic and related expenses, past and future;

e. Loss of earnings and earning capacity; and

f. Such other damages that will be shown at trial.

78. Plaintiff seeks any and all damages to which she may be entitled. As stated, Plaintiff also seeks exemplary damages in an amount within the jurisdictional limits of the Court.

## VIII. NOTICE OF INTENT TO USE DISCOVERY AT TRIAL

79. Plaintiff hereby gives notice that she intends to use all discovery instruments produced in this case at trial. Such discovery instruments include, but are not limited to, all documents Defendants will produce, or have produced, in response to Plaintiff's written discovery requests.

## IX. REQUEST FOR JURY TRIAL

80. Plaintiff demands a jury trial. The appropriate jury fee has been or will be paid to the clerk of the court within thirty (30) days in advance of the trial setting

## X. PRAYER

81. By reason of all the above and foregoing, Plaintiff is entitled to recover from Defendants the damages set forth in this petition, within the jurisdictional limits of this Court. Plaintiff also seeks pre-and post-judgment interest at the maximum legal rate, costs of court, punitive damages, and any other relief to which Plaintiff may be justly entitled.

[*Signature Block on Following Page*]

Respectfully submitted,

**THE BUZBEE LAW FIRM**

By: */s/ Anthony G. Buzbee*
Anthony G. Buzbee
State Bar No. 24001820
Fed. ID. No. 22679
tbuzbee@txattorneys.com
Caroline E. Adams
cadams@txattorneys.com
State Bar No. 24011198
Fed. ID. No. 27655
Meredith Drukker Stratigopoulos
mdrukker@txattorneys.com
Fed. ID. No. 3465122
JPMorgan Chase Tower
600 Travis Street, Suite 7500
Houston, Texas 77002
Tel: (713) 223-5393
Fax: (713) 223-5909
www.txattorneys.com

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this document has been duly served on all known counsel of record and pro se parties in accordance with the Federal Rules of Civil Procedure on October 9, 2025 by E-Service.

*/s/ Caroline E. Adams*
Caroline E. Adams